EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.,* <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **CARDTRONICS, INC.,** *et al.,* <br><br> **Defendants.** | CIVIL ACTION NO. 03-11206-NMG |

## AMENDED AND RESTATED
## CLASS ACTION SETTLEMENT AGREEMENT

By the Plaintiffs:

Commonwealth of Massachusetts
Office of the Attorney General
One Ashburton Place
Boston, Massachusetts  02108

National Federation of the Blind
1800 Johnson Street
Baltimore, Maryland 21230

Bryan Bashin
Jennifer Bose
Norma Crosby
Robert Crowley
Dwight Sayer
Terri Uttermohlen
Raymond Wayne

By the Defendants:

Cardtronics, Inc.
Cardtronics USA, Inc.
3250 Briarpark Drive, Suite 400
Houston, Texas 77042

Dated:  November 21, 2014

# TABLE OF CONTENTS

DEFINITIONS ........................................................................................................... 1

PREAMBLE ............................................................................................................. 5

PROMISES, COVENANTS, AND RELEASES ...................................................... 6

1.     EFFECTIVE DATE ............................................................................ 6

2.     PROCEDURES FOR CLASS-WIDE SETTLEMENT ...................... 6

     2.1    Pending Motions. ..................................................................... 6

     2.2    Preliminary Approval. .............................................................. 6

     2.3    Notice. ...................................................................................... 7

     2.4    Objections to Agreement. ........................................................ 7

     2.5    Final Approval Hearing and Order. ......................................... 7

     2.6    Right to Withdraw from Settlement. ....................................... 8

     2.7    Prior Court Orders. .................................................................. 8

     2.8    Best Efforts. ............................................................................. 8

3.     VOICE GUIDANCE STANDARDS ................................................. 8

     3.1    Definition of Voice Guidance. ................................................ 8

     3.2    Basic Voice Guidance Features. .............................................. 9

     3.3    Tactilely Discernible Controls. .............................................. 10

     3.4    Advertising. ............................................................................. 11

     3.5    Language. ................................................................................. 11

     3.6    Headphones. ............................................................................ 11

     3.7    Advanced Voice Guidance Features. ....................................... 11

     3.8    Definition of Undue Burden. .................................................. 13

4.     BRAILLE INSTRUCTIONS .............................................................. 13

5.     VOICE GUIDANCE SOFTWARE REVIEW & APPROVAL ........... 14

|      | 5.1  | Process. | 14 |
|      | 5.2  | Future Technology Development/Changes Affecting Voice Guidance. | 15 |
| 6.   |      | VOICE GUIDANCE & BRAILLE INSTALLATION ON EXISTING FLEET | 16 |
|      | 6.1  | Existing Cardtronics-Owned ATMs. | 16 |
|      | 6.2  | Existing Merchant-Owned ATMs. | 16 |
| 7.   |      | NEWLY-ACQUIRED ATMS | 16 |
|      | 7.1  | Newly-Acquired Cardtronics-Owned ATMs. | 16 |
|      | 7.2  | Newly-Acquired Merchant-Owned ATMs. | 17 |
|      | 7.3  | ATMs Removed From Cardtronics' Processing Platform. | 17 |
|      | 7.4  | Multiple ATMs at Single Location. | 17 |
| 8.   |      | DIVESTED ATMS | 18 |
| 9.   |      | MERCHANT RENEWALS & SALES | 18 |
| 10.  |      | FIELD INSPECTIONS & NFB TESTING | 18 |
|      | 10.1 | Field Inspections. During Phase I of this Agreement, as well as Phase II to the extent required by Subsection 19.2. | 18 |
|      | 10.2 | NFB Testing. | 18 |
|      | 10.3 | Prompt Repairs. | 19 |
| 11.  |      | REPORTING | 19 |
|      | 11.1 | Monthly VG/Braille Installation Reports. | 19 |
|      | 11.2 | Quarterly Fleet Reports. | 19 |
| 12.  |      | WEB LOCATOR | 19 |
| 13.  |      | CARDTRONICS ACCESSIBILITY CENTER OF EXCELLENCE. | 19 |
|      | 13.1 | Accessibility Center of Excellence. | 19 |
|      | 13.2 | Company-Wide Policy Statement. | 20 |

14. CHANGES IN LAWS GOVERNING ACCESSIBILITY OF ATMS ............................................................................................... 20

    14.1 New Laws. ......................................................................... 20

    14.2 Notice of Modification of Agreement ..................................... 20

15. NO ADMISSION OF LIABILITY ............................................... 21

    15.1 Purpose of Agreement ......................................................... 21

    15.2 No Admissions. ................................................................... 21

    15.3 No Use of Agreement. ......................................................... 21

    15.4 No Effect of Court Approval or Rejection ............................... 21

16. RELEASE ................................................................................. 22

    16.1 Scope of Release. ................................................................ 22

    16.2 Release of Claims. ............................................................... 23

    16.3 No Effect On Obligations Imposed In This Agreement. ............ 23

17. THIRD-PARTY BENEFICIARIES ........................................... 23

    17.1 Acknowledged Beneficiaries. ............................................... 23

    17.2 No Other Beneficiaries. ....................................................... 23

18. PAYMENTS BY CARDTRONICS ............................................ 23

    18.1 Payments to the NFB and the Commonwealth. ....................... 23

    18.2 Attorneys' Fees and Costs. .................................................. 24

    18.3 Arbiter and NFB Consultant Fees ......................................... 24

19. TERM OF AGREEMENT .......................................................... 24

    19.1 Phase I: Certificates of Completion. ..................................... 24

    19.2 Phase II: Remaining Obligations .......................................... 25

20. FURTHER ACTS ...................................................................... 25

21. DISPUTE RESOLUTION & LIQUIDATED DAMAGES ............ 25

    21.1 Notification of Non-Compliance and Opportunity to Cure. ....... 25

iv

21.2    Meet and Confer. ........................................................................ 26

21.3    Submission to Arbiter. ............................................................... 26

21.4    Liquidated Damages. ................................................................. 27

22.    GOVERNING LAW ............................................................................ 28

23.    FORCE MAJEURE .............................................................................. 29

23.1    Performance Made Impossible by Third Parties ...................... 29

23.2    Extension of EMV Liability Shift Date. ................................... 29

23.3    Disputes as to Extensions ......................................................... 29

24.    NOTICE TO PARTIES .......................................................................... 29

25.    SEVERABILITY ................................................................................... 30

26.    DUTIES OF SIGNATORIES ................................................................. 30

27.    BINDING UPON SUCCESSORS ......................................................... 31

28.    DELEGATION ...................................................................................... 31

29.    AUTHORITY TO ENTER AGREEMENT ........................................... 31

30.    DRAFTING OF AGREEMENT ............................................................ 31

31.    NON-WAIVER OF BREACH .............................................................. 31

32.    INTEGRATION CLAUSE ..................................................................... 32

33.    AMENDMENTS OR MODIFICATIONS ............................................. 32

34.    HEADERS IN THIS AGREEMENT ..................................................... 32

35.    SIGNATURE IN COUNTERPARTS .................................................... 32

36.    TRANSMITTED COPIES .................................................................... 32

APPENDIX A:  ORGANIZATIONS TO RECEIVE A COPY OF THE
SETTLEMENT NOTICE (SUBSECTION 2.3)

APPENDIX B:  CONTENTS OF IMPLEMENTATION GUIDEBOOK

This Amended and Restated Class Action Settlement Agreement ("Agreement") is entered into by and between Cardtronics, Inc. and Cardtronics USA, Inc. (jointly "Cardtronics," each a "Defendant"), the Commonwealth of Massachusetts ("Commonwealth"), the National Federation of the Blind ("NFB"), and Jennifer Bose, Bryan Bashin, Robert Crowley, Norma Crosby, Dwight Sayer, Terri Uttermohlen, and Raymond Wayne (the "Individual Plaintiffs"). The NFB and Individual Plaintiffs enter this Agreement individually and on behalf of a class of persons similarly situated (hereinafter referred to as the "Class" and defined below). Cardtronics, the Commonwealth, the NFB, and the Individual Plaintiffs (individually and on behalf of the Class) shall each be referred to herein as a "Party" and jointly as the "Parties."

## DEFINITIONS

"2007 Class Action Settlement Agreement" means the Class Action Settlement Agreement approved by the Court as part of its Final Order dated December 4, 2007.

"2010 Remediation Plan" means the Court's Order Granting Joint Motion for Final Approval of Proposed Remediation Plan Concerning Class Action Settlement Agreement, dated November 3, 2010.

"2010 ADA Standards" mean the U.S. Department of Justice's 2010 Standards for Accessible Design, 28 C.F.R. Part 36, effective March 15, 2012.

"Accessibility Center of Excellence" is defined in Subsection 13.1.

"Advanced Voice Guidance Features" and "Advanced VG Software" are defined in Subsection 3.7.

"Agreement" means this Amended and Restated Class Action Settlement Agreement.

"Arbiter" means David R. Cohen, Esq., of Cleveland, Ohio, or should he become unavailable during the Term of this Agreement, a replacement agreed to by the Parties.

"ATM" means an Automated Teller Machine.

"Automated Teller Machine" means a self-service electronic information processing device installed in public locations for the primary purpose of conducting consumer financial transactions directly through the device. Such consumer financial transactions may include not only typical banking type transactions such as cash withdrawals from accounts, deposits to accounts, reports of account balances, transfers between accounts, and other routine banking transactions; but may also include the payment and/or purchase of goods and services through the device, such as, for example, the purchase of stamps and movie tickets, as well as the payment of utility and cellular telephone bills.

"Basic Voice Guidance Features" and "Basic VG Software" are defined in Subsection 3.2.

"Blind" means total blindness or central vision acuity not to exceed 20/200 in the better eye, with corrective lenses, as measured by the Snellen test, or visual acuity greater than 20/200, but with a limitation in the field of vision such that the widest diameter of the visual field subtends an angle not greater than 20 degrees.

"Branded ATM" means any ATM owned by Cardtronics where Cardtronics permits a third party, such as a bank, credit union, or any other card issuer to place its name and/or trademark on the ATM and permits that institution's cardholder to make cash withdrawals at the ATM without paying a surcharge.

"Cardtronics-Owned ATM" means an ATM that Cardtronics owns.

"Class" means all persons who are Blind patrons of Covered ATMs.

"Class Counsel" means Sharon Krevor-Weisbaum and Daniel Goldstein of the law firm Brown Goldstein & Levy LLP, Baltimore, Maryland; Christine Netski of the law firm Sugarman, Rogers, Barshak & Cohen, P.C., Boston, Massachusetts; and Timothy Fox and Amy Robertson of the Civil Rights Education and Enforcement Center, Denver, Colorado.

"Class Representatives" mean the persons and/or entities appointed as Class Representatives by the Court.

"Completion Date" is defined in Subsection 19.1.4.

"Contempt Proceedings" means Plaintiffs' second motion for contempt and related proceedings in the case *Commonwealth of Massachusetts et al. v. Cardtronics, Inc. et al.*, No. 03-11206 (NMG), now pending in the U.S. District Court for the District of Massachusetts.

"Counsel" means: for the Commonwealth, the Attorney General of the Commonwealth of Massachusetts or an Assistant Attorney General acting as her designee; for the NFB, the law firm Brown Goldstein & Levy LLP in Baltimore, Maryland, the law firm Sugarman, Rogers, Barshak & Cohen, P.C. in Boston, Massachusetts, and the Civil Rights Education and Enforcement Center in Denver, Colorado; and for Cardtronics, the law firm Cooley LLP.

"Court" means the U.S. District Court for the District of Massachusetts, and specifically the Honorable U.S. District Judge Nathaniel Gorton or his designated successor.

"Covered ATM" means (1) all Cardtronics-Owned and Merchant-Owned ATMs in Cardtronics' Existing Fleet and (2) any Newly-Acquired Cardtronics-Owned or Merchant-Owned ATMs; provided, however, if now or in the future Cardtronics provides third-party services for ATMs it does not own (including maintenance, armored courier, or ATM transaction processing) in a capacity other than as an ISO/IAD, any ATM for which Cardtronics provides only such third-party services shall not be considered a Covered ATM. For the purpose of this definition, any ATM that is now or hereafter registered with any Network or sponsoring financial institution, and whose registration shows or reflects that Cardtronics is the ISO/IAD for that ATM, shall be considered a Covered ATM.

"Dedicated Function Keys" is defined in Section 3.3.

"Divest" as to a Cardtronics-Owned ATM means that Cardtronics shall no longer operate an ATM; and as to a Merchant-Owned ATM means that Cardtronics shall no longer operate or provide any processing or other services for the ATM in the capacity of an ISO/IAD.

"EMV Liability Shift Date" means a date after March 31, 2017, on which ATM owners and operators become liable for any and all fraud losses attributable to transactions at their ATMs, if such ATMs are not equipped with EMV technology.

"EMV Upgrade" means  making the necessary changes to an ATM so as to allow the ATM to read not only the data on an ATM card's magnetic stripe, but also to read a chip embedded in the card that is linked by the issuer to the cardholder (this technology is commonly referred to as "EMV" or "pin and chip").

"Existing Fleet" means all Cardtronics-Owned and Merchant-Owned ATMs in Cardtronics' domestic fleet (that is, located within the borders of United States) as of December 1, 2014, or the date of Final Approval, whichever is earlier.

"Final Approval" or "Final Approval Order" means the approval of this Agreement by a United States District Judge, as set forth in Subsection 2.5 below, by signature of an order in a form substantially similar to that submitted by the Parties that, among other things, attaches this Agreement as an exhibit, retains jurisdiction for the Court for the Term of this Agreement in order to enforce this Agreement, and has become final and non-appealable.

"Full Compliance" is defined in Subsection 19.1.2.

"Implementation Guidebook" means the compilation of protocols, forms, and similar documents identified in Appendix B, which the Parties and the Arbiter will use to implement the terms of this Agreement, which the Parties have agreed upon prior to executing this Agreement, and which may be changed from time to time by mutual agreement of the Parties without the need for Court approval.

"Individual Plaintiffs" means Jennifer Bose, Bryan Bashin, Robert Crowley, Norma Crosby, Dwight Sayer, Terri Uttermohlen, and Raymond Wayne.

"Independent Sales Organization (ISO)," "Independent ATM Deployer (IAD)," and "ISO/IAD" shall mean an entity, such as Cardtronics, that is sponsored by a financial institution and is registered with one or more Networks and through such sponsorship and registration is able to facilitate Transactions at an ATM.

"Lawsuit" means the case *Commonwealth of Massachusetts et al. v. Cardtronics, Inc. et al.*, No. 03-11206 (NMG), which was initially resolved by the 2007 Class Action Settlement Agreement, later modified by the 2010 Remediation Plan.

"Massachusetts state law" means any statutory, administrative, municipal or common law of the Commonwealth of Massachusetts or any governmental entity therein, including but not limited to the Massachusetts Public Accommodations Act, M.G.L. c. 272, §§ 92A and 98, and the Massachusetts Equal Rights Act, Mass. Const. Art. Amend. 114 and M.G.L. c. 93, § 103.

"Merchant" means the independent third-party that owns, leases, or otherwise manages a Merchant-Owned ATM.

"Merchant-Owned ATM" means an ATM that Cardtronics does not own (that is, not Cardtronics-Owned) but for which Cardtronics, in its capacity as an ISO/IAD, provides Transaction processing services and sometimes ancillary services, such as maintenance and repair or armored courier services.

"Networks" shall mean any of the various electronic fund transfer networks, including, without limitation, Cirrus, MasterCard, Maestro, Plus, Pulse, Visa and NYCE.

"Newly-Acquired ATM" means either a Cardtronics-Owned ATM or a Merchant-Owned ATM in which Cardtronics first obtains an interest, or a Merchant-owned ATM for which Cardtronics otherwise becomes the operator or processor, subsequent to December 1, 2014, or the date of Final Approval, whichever is earlier.

"Notice of Noncompliance" is defined in Subsection 21.1.

"Phase I" is defined in Subsection 19.1

"Phase II" is defined in Subsection 19.2.

"Processing Platform" means a system comprising hardware, software and resources in operation for the purpose of driving, routing, and settling ATM transactions.

"Released Claims" is defined in Subsection 16.1.1.

"Settlement Fund" is defined in Subsection 18.1.2.

"Software Review Process" is defined in Subsection 5.1.1.

"Surcharge Inspection" means a field inspection during which Cardtronics (or a qualified vendor hired by Cardtronics) tests an ATM's Voice Guidance functionality by conducting a withdrawal transaction through the point where the ATM asks the user to agree to a surcharge, if there is a surcharge for that transaction, or to a point prior to the final step to complete the transaction if there is no surcharge. The protocol that the Parties have agreed upon for such inspections, including inspections on surcharge-free transactions, shall be included in the Implementation Guidebook.

"Term" is defined in Subsection 19.1.1.

"Title III of the ADA" means Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181–12189, and any implementing regulations, including but not limited to, 28 C.F.R. Part 36, and the Department of Justice's 2010 ADA Standards for Accessible Design.

"Transaction" means a consumer financial transaction, including typical banking transactions, such as cash withdrawals from accounts (without regard to whether the transaction was denied because of the lack of funds), deposits to accounts, reports of account balances, transfers between accounts and other routine banking transactions, and the payment and/or purchase of goods and services, such as the purchase of stamps and movie tickets and the payment of utility and cellular telephone bills.

"Undue Burden" is defined in Subsection 3.8.

"VG-Capable ATM" means an ATM that has the necessary hardware and is otherwise capable of functioning with the Voice Guidance software required by the Agreement.

"Voice-Guided" and "Voice Guidance" as to an ATM means that the ATM is speech enabled as set forth in Section 3.1 of this Agreement.

## PREAMBLE

WHEREAS federal law requires that ATMs comply with Sections 220 and 707 of the Department of Justice's 2010 ADA Standards for Accessible Design, as adopted in September 2010 and effective as of March 15, 2012;

WHEREAS Cardtronics operates a nationwide fleet of ATMs consisting of Cardtronics-Owned ATMs and Merchant-Owned ATMs;

WHEREAS the Plaintiffs seek to secure equal access to ATMs for Blind patrons on terms that are reasonable and fair;

WHEREAS Cardtronics is committed to full compliance with the law and seeks to deliver industry-leading Voice Guidance to Blind patrons of its ATMs.

WHEREAS, in December 2007, the Court approved the 2007 Class Action Settlement Agreement between the Parties, resolving a lawsuit Plaintiffs filed against Defendants pursuant to Title III of the ADA and Massachusetts state law;

WHEREAS, in November 2010, the Court approved the 2010 Remediation Plan proposed by the Parties to resolve disputes as to Cardtronics' compliance with and ability to further perform the 2007 Class Action Settlement Agreement;

WHEREAS, in July 2011 and August 2012, the Plaintiffs filed motions for contempt, alleging that Defendants had not complied in full with the terms of the 2007 Class Action Settlement and 2010 Remediation Plan, and Defendants opposed those motions;

WHEREAS, the Parties desire to resolve amicably all matters between them, including, but not limited to, any matters arising out of or related to the Contempt Proceedings, and to avoid the further expense and inconvenience of the Contempt Proceedings;

WHEREAS, the terms and conditions of this Agreement have been agreed to after and as a result of arms-length negotiations between and among the Parties, in which the Parties consulted counsel of their choice;

WHEREAS, the Parties agree that this Agreement involves the mutual exchange of promises and obligations that are in exchange for and in settlement of claims and liabilities of potentially substantially greater value, where such claims and liabilities have been discounted by the Parties in their judgment as to the risk of success or failure in judicial proceedings and the time-value of such judgments should they ever be rendered; and

WHEREAS, Class Counsel conducted an extensive investigation of facts, circumstances, and law underlying the issues raised in the Lawsuit and Contempt Proceedings and based on the facts and applicable law, and upon consideration of the benefits this Agreement affords the Class Representatives and the Class, Class Counsel considers it to be in the best interests of the Class to enter into this Agreement;

THEREFORE, in consideration of the promises, covenants and releases herein, the receipt and sufficiency of which the Parties acknowledge, the Parties agree to the following:

## PROMISES, COVENANTS, AND RELEASES

### 1.  **EFFECTIVE DATE**

Section 2 (Procedures for Class-Wide Settlement) of this Agreement shall be effective immediately upon the last date any signatory executes this Agreement.  The remaining provisions of this Agreement shall be effective immediately upon Final Approval.  The Agreement shall continue in effect until termination or expiration in accordance with the provisions herein.

### 2.  **PROCEDURES FOR CLASS-WIDE SETTLEMENT**

#### 2.1  **Pending Motions.**

The Parties agree to request that the Court stay resolution of all pending motions and, upon Final Approval, dismiss all such motions as moot.

#### 2.2  **Preliminary Approval.**

As a condition of settlement, the Parties agree to file a joint motion with the Court for entry of an order granting Preliminary Approval of this settlement, finding that the manner of notice described herein is the only notice required and that such notice satisfies the requirements of due process and Fed. R. Civ. P. 23, and scheduling a hearing for Final Approval of this Agreement.

**2.3    Notice.**

Subject to Court approval, notice of the settlement will be provided to the Class by: (1) making the notice and this Agreement available on the NFB's and Cardtronics' websites until the date objections are due under Subsection 2.4; (2) e-mailing a copy of the notice to the list of organizations attached hereto as Appendix A; and (3) publishing the notice as a one-half page advertisement in the *Braille Monitor* and the *Braille Forum*. Cardtronics shall bear the cost of providing notice to the Class.

**2.4    Objections to Agreement.**

The Parties shall petition the Court to order that Class members who wish to object to approval of this Agreement must provide notice and explanation of their objection in writing to the Court, with copies to all Counsel, no later than forty-five (45) days after publication of the notice described in Subsection 2.3. Objections received by the Court after this deadline shall be deemed untimely and shall be disregarded. Only those Class members who file timely written objections shall have the right, and only if they expressly seek it in their objection, to present objections orally at the Final Approval Hearing. The parties shall respond to any objections by a date no later than ten (10) days prior to the Final Approval Hearing.

**2.5    Final Approval Hearing and Order.**

The Parties shall petition the Court to hold a Final Approval Hearing and enter a Final Order Granting Joint Motion for Approval of Amended and Restated Class Action Settlement Agreement ("Final Approval" or "Final Approval Order") on a date not less than seventy (70) days after publication of the notice described in Subsection 2.3. No later than ten (10) days before the Final Approval Hearing, the Parties shall furnish the Court a proposed Final Approval Order requesting, on behalf of the Parties, entry of the Final Approval Order in these Contempt Proceedings. The proposed Final Approval Order shall:

(a). Find that this Agreement is a fair, reasonable and adequate settlement of all of the claims of the Class against the Defendants, reject and overrule any objection to this Agreement, find that each Class Member shall be bound by this Agreement including its release, and conclude that this Agreement should be and is approved;

(b). Dismiss the Lawsuit and Contempt Proceedings on the merits and with prejudice as to all claims against all of the Defendants;

(c). Retain jurisdiction of all matters relating to the interpretation, administration, implementation, effectuation and enforcement of this Agreement; and

(d). Attach and incorporate by reference the terms of this Agreement.

**2.6     Right to Withdraw from Settlement.**

In the event the Court disapproves of or sets aside this Agreement or any material part hereof for any reason, including if notice is deemed insufficient or an objection is found to have merit, or holds that it will not enter or give effect to the Final Approval Order in substantially the same form described in Subsection 2.5, or holds that the entry of the Final Approval Order or any material part thereof should be overturned or modified in any material way, then:

(a).  The Parties shall first meet and confer to attempt to address any shortcomings in the Agreement identified by the Court and, if it is possible to reach agreement on terms that accomplish this end, jointly request leave to resubmit a revised agreement for approval substantially as set forth in Subsection 2.2.

(b).  If, following the Court's disapproval and any subsequent appeal(s), the Final Approval Order or its equivalent in all material respects is not in effect after the termination of all proceedings arising therefrom, this Agreement shall become null and void; the Contempt Proceedings may continue; and any and all orders entered pursuant to this Agreement shall be vacated and the Contempt Proceedings shall return to their status prior to May 28, 2014.  In that event, among other things, the Court will set deadlines for the filing of objections to the Special Master's Report and Recommendation.

**2.7     Prior Court Orders.**

The Parties shall not request the Court to vacate or withdraw any orders entered by the Court in the course of this litigation.

**2.8     Best Efforts.**

The Parties shall cooperate fully with each other, and shall use their best efforts to obtain Court approval of this Agreement and all of its terms and to defend this Agreement from any legal challenge, whether by appeal or collateral attack.

**3.     <u>VOICE GUIDANCE STANDARDS</u>**

**3.1     Definition of Voice Guidance.**

"Voice-Guided" and "Voice Guidance" as to an ATM means that the ATM shall be speech enabled.  Such speech shall be delivered through an industry standard connector (*i.e.*, headphone jack) located on the face of the ATM, and shall provide audible instructions and information in recorded human, digitized human, or computer synthesized voice form.  The method of initiating the speech mode should be easily discoverable (including through the presence of Braille instructions, as required by Section 4) and should not require specialized training.

**3.2    Basic Voice Guidance Features.**

3.2.1.        Consistent with the purposes of this Agreement, an ATM's Basic Voice Guidance functionality shall:

(a).   Be of sufficient quality and clarity that the speech is reasonably understood by the average user.

(b).   Provide the same degree of privacy of input and output (as long as the user does not unplug his/her headphones mid-Transaction) available to all users.

(c).   Provide audible operating instructions and an orientation to the layout of the ATM, which shall be readily accessible upon the initiation of Voice Guidance. Such instructions and orientation shall include:

    i.     Instructions as to how to insert the ATM card.
    ii.    The location of the numeric keypad, Dedicated Function Keys (*see* Subsection 3.3, below), cash dispenser, and receipt chute.
    iii.   Any other physical components of the ATM reasonably necessary for the user to operate the ATM.

(d).   Allow the user to interrupt audible instructions.

(e).   Allow the user to cause audible instructions to repeat.

(f).   Allow the user to control the volume of the speech output.

(g).   Allow the user to review and correct entries without canceling the entire Transaction to the same extent that all users of the ATM can so review and correct entries for the particular Transaction.

(h).   Provide audible Transaction prompts to enable completion of each step in each Transaction, including:

    i.     Instructions to press "Enter" when necessary.
    ii.    Instructions as to when and where the user can collect his/her receipt, cash, and any other item issued by the ATM.
    iii.   Confirmation that the Transaction is completed.
    iv.    Instructions to remove headset.

(i).   Provide audible verifications for all inputs, including:

    i.     Audible tones instead of speech for input that is not displayed for security purposes (*e.g.*, personal identification numbers).
    ii.    At a minimum, an "echo" effect for all valid inputs made using the numeric keypad, meaning that the user's numeric entries (other than the entry of a personal identification number) are repeated in voice form.

9

iii. At a minimum, an audible tone verifying all valid inputs made using a Dedicated Function Key.

iv. At a minimum, when the user presses an invalid numeric key or invalid Dedicated Function Key, the ATM shall: (1) eventually ask the user if he needs more time before cancelling the transaction, in accordance with Subsection 3.7.1(d)(vii); and (2) repeat the last instructions given if the user indicates he does need more time.

v. For purposes of this Subsection 3.2.1(i) and Subsections 3.7.1(d)(v-vi), the terms "valid input" and "valid selection" shall refer to entries or selections that are available to the user at the point in the Transaction when the user presses the particular key at issue. The terms "invalid input" and "invalid selection" shall refer to all other entries or selections. (For example, if the ATM instructs the user to select from numeric entries 1, 2, or 3 in order to proceed with the Transaction, pressing "2" is a valid input, while pressing "5" or "Enter" is an invalid input.)

(j). Provide audible notification whenever a Transaction is cancelled.

(k). Where receipts are provided, provide balance inquiry information, error messages, and all other information on the printed receipt necessary to complete or verify the Transaction. The machine location, date and time of Transaction, customer account number, and machine identifier arenot required to be audible. Printed copies of bank statements and checks are not required to be audible.

(l). Provide audible messages informing the user that an error has occurred.

3.2.2. Voice Guidance software that has been approved by the Arbiter in accordance with Section 5 (Voice Guidance Software Review & Approval) as satisfying all elements of this Subsection 3.2 shall be referred to herein as "Basic VG Software."

### 3.3    Tactilely Discernible Controls.

All Covered, Voice-Guided ATMs shall have tactilely discernible controls – that is, operating mechanisms used in conjunction with the speech output that can be located and operated by feel. At least one tactilely discernible input control shall be provided for each user entry or selection. In addition, "Dedicated Function Keys" shall be provided for each of the following functions: Enter, Clear/Correct, Cancel, and Add/Decrease Value. When a numeric keypad is part of the tactilely discernible controls, all user entries and selections prompted by an ATM's Voice Guidance will be mapped to the numeric keypad; provided, however, with respect to ATMs that do not support mapping (*e.g.*, the Diebold 500/520 series), if an input control is not located on the keypad (*e.g.*, it is located adjacent to the screen), the Voice Guidance shall include audible instructions and orientation to the user to enable him to locate and use the input control. Numeric keypads, Dedicated Function Keys, and other tactilely discernible controls shall comply with applicable regulations, including but not limited to, the "contrast" and "tactile symbols" required by Section 707.6.3 of the 2010 ADA Standards.

10

**3.4     Advertising.**

Advertising posted on or near the ATM, printed on a receipt, or displayed on the ATM screen, is not required to be conveyed in voice form, unless such advertising conveys information that can be used in the Transaction being conducted.

**3.5     Language.**

Voice Guidance shall be provided in English and may, at Cardtronics' sole discretion, be provided in one or more additional languages.

**3.6     Headphones.**

Voice Guidance does not include the provision of headphones, which shall be the sole responsibility of the user.

**3.7     Advanced Voice Guidance Features.**

3.7.1.     The following Advanced Voice Guidance Features shall be included in an ATM's Voice Guidance functionality unless the ATM's existing internal hardware (not including the headphone jack) is not capable of supporting such functionality or adding the functionality would result in an Undue Burden:

(a).   Audible verification of the valid function chosen by the user via either the numeric keypad (*e.g.*, withdrawal, transfer, etc.) or one of the Dedicated Function Keys (*e.g.*, Enter, Cancel, etc.) shall be provided in lieu of, or in addition to, the "echo" or other audible verification required by Subsection 3.2.1.(i), above (*see* Subsections 3.7.1(d)(v-vi) for invalid inputs and selections);

(b).   Audio feedback (*i.e.*, an audible tone or speech) will confirm that the user is increasing or decreasing the volume.

(c).   If a user presses the "Cancel" button or the Transaction fails, audible instruction will direct the user to remove the headphone jack to conclude the visit to the ATM.

(d).   With regard to audible error messages described in Subsection 3.2.1(l), above, audible notification shall provide the following messages (with the understanding that the precise wording and phrases provided below are not intended to exclude or prohibit the use of other words or phrases that have comparable or equivalent meaning):

i.     When the ATM is unable to communicate to the card issuer, then the audio error message will be something substantially similar to: "This ATM is unable to communicate to your financial institution, please try again later."

ii.    When the ATM has a hardware malfunction, then the audio message shall be (if the ATM is still able to provide an audio message): "This ATM is out of service, please try again later."

iii.    When the Transaction is not allowed by the card issuer, then the audio message shall be: "This transaction is not allowed, please contact your financial institution."

iv.    When the user enters an invalid PIN, then the audio message shall be: "Invalid PIN entered, please re-enter."

v.    When the user presses an invalid numeric key, the ATM shall respond with the first option that the ATM's internal hardware is capable of supporting among the following options (listed in order from first to last):

    1.    Provide (a) an "echo" effect for the invalid key, meaning that the user's numeric entry will be repeated in voice form; and (b) a message advising the user that his selection was invalid, and then repeat the last instructions given

    2.    Provide an "echo" effect for the entry and then repeat the last instructions given.

    3.    Provide only an "echo" effect for the entry, so long as doing so does not lengthen the amount of time that passes before the ATM asks the user if he needs more time (see Subsection 3.7.1(d)(vii)).

    4.    Provide only the Basic Voice Guidance functionality set forth at Subsection 3.2.1(i)(iv), which shall not be subject to the Undue Burden analysis.

vi.    When the user presses an invalid Dedicated Function Key, the ATM shall respond with the first option that the ATM's internal hardware is capable of supporting among the following options (listed in order from first to last):

    1.    Provide (a) audible verification of the function corresponding to the key pressed (*e.g.*, Enter, Cancel, etc.); and (b) a message advising the user that his selection was invalid.

    2.    Provide a message advising the user that his selection was invalid.

    3.    Provide an audible tone verifying the input.

4.  Provide only the Basic Voice Guidance functionality set forth at Subsection 3.2.1(i)(iv), which shall not be subject to the Undue Burden analysis.

vii.  Prior to cancelling a Transaction due to user inactivity, the ATM will ask the user if he needs more time.

(e).  At the conclusion of a Transaction, audible verification of the nature of the Transaction (*e.g.*, withdrawal, transfer, etc.), the account(s) implicated (*e.g.*, checking, savings, etc.), and the amount of funds subject to the Transaction.

3.7.2.  Voice Guidance software that has been approved by the Arbiter in accordance with Section 5 (Voice Guidance Software Review & Approval) as having *both* the Basic Voice Guidance Features set forth in Subsection 3.2 and the applicable Advanced Voice Guidance Features, if any, set forth in this Subsection 3.7 (meaning those features that the existing internal hardware is capable of supporting and that will not result in an Undue Burden), shall be referred to herein as "Advanced VG Software." For the avoidance of doubt, Voice Guidance software that has been approved as having all Basic Voice Guidance Features and has been exempted from all Advanced Voice Guidance Features in accordance with Subsection 5.1.5, will nonetheless be deemed as Advanced VG Software for purposes of this Agreement.

**3.8  Definition of Undue Burden.**

"Undue Burden" means the required effort would be unduly costly, difficult, extensive, substantial, or disruptive, in light of the totality of the circumstances. The Arbiter shall consider the following factors in determining whether any of the Advanced Voice Guidance Features results in an undue burden: the number of ATMs affected; the remaining lifespan of the affected ATMs; the relative number of Transactions affected; the need for additional cooperation from third parties (*e.g.*, manufacturers, etc.); the additional costs involved relative to the other Voice Guidance development efforts required by this Agreement; the additional administrative burden; and the complexity of implementation. The term "Undue Burden" is not intended to be coextensive or synonymous with the term "undue hardship" defined in 42 U.S.C. § 12111.

**4.  BRAILLE INSTRUCTIONS**

In accordance with the timeframes set forth in Section 6 (Voice Guidance & Braille Installation on Existing Fleet) and Section 7 (Newly-Acquired ATMs), each Voice-Guided, Covered ATM shall have high-contrast Braille decals affixed thereto (or, as applicable, provided to the Merchant) instructing users as to how to initiate the ATM's speech mode and separately identifying the locations of the headphone jack, card reader, cash dispenser, and receipt chute. The Braille decals shall use Grade-2 Braille. The Braille decals that the Parties have agreed upon for the Existing Fleet shall be included in the Implementation Guidebook, and any decals developed thereafter shall be materially similar in design.

5.      **VOICE GUIDANCE SOFTWARE REVIEW & APPROVAL**

**5.1     Process.**

5.1.1.      During Phase I, Cardtronics will develop (as necessary) updated Voice Guidance software for its Existing Fleet of ATMs that satisfies the standards set forth in Section 3 and submit that software to review by the Arbiter and a consultant chosen by the NFB. The Arbiter and the NFB consultant will review the software, using a protocol agreed upon by the Parties and included in the Implementation Guidebook, in order to determine if the software does, in fact, satisfy the Voice Guidance standards. If the Arbiter determines in his discretion, after conferring with Cardtronics and the NFB consultant, that the software fails to satisfy any element of the Voice Guidance standards, Cardtronics shall be required to correct the failure(s) and resubmit the software to the Arbiter and NFB consultant for further review using the same protocol. Similarly, if the NFB consultant identifies any issue with an ATM's Voice Guidance functionality that is not clearly addressed by the standards set forth in Section 3, the Arbiter will make a final determination as to whether the issue identified by the NFB Consultant impedes accessibility more than minimally and therefore must be corrected. The software review and approval process as to Cardtronics' Existing Fleet shall be referred to herein as the "Software Review Process."

5.1.2.      If, subsequent to the Software Review Process (but still during Phase I of the Term), Cardtronics acquires new or different ATM makes or models that had not previously been through the Software Review Process, Cardtronics will submit the Voice Guidance software for those ATMs to testing by the Arbiter and the NFB consultant, using the same process described in this Subsection 5.1, on a date consistent with the timing of Cardtronics' obligations relating to Newly-Acquired ATMs.

5.1.3.      The Software Review Process may not be attended by any attorney for a Party. Cardtronics' engineers and other personnel will be permitted to attend as appropriate. The Arbiter may preclude attendance by any person in his discretion.

5.1.4.      Cardtronics will provide the Arbiter and Plaintiffs with a software development and review schedule in advance to ensure timely, consistent progress toward satisfying its obligations under this Agreement.

5.1.5.      Utilizing the "Undue Burden" analysis described in Subsection 3.7.2 above, the Arbiter shall determine which Covered ATMs, if any, will be exempt from having one or more of the Advanced Voice Guidance Features identified in Subsection 3.7. With respect to the ATM makes and models in Cardtronics' Existing Fleet, the Arbiter shall make this determination prior to or during the Software Review Process. If Cardtronics later acquires new or different ATM makes or models, the Arbiter will make a determination as to those ATMs on a date consistent with the timing of Cardtronics' obligations relating to Newly-Acquired ATMs.

5.1.6.      The Software Review Process will be applied to all ATM makes and models in Cardtronics' Existing Fleet  except as follows: (a) if Cardtronics intends to install more than one version of software on a particular make and model, then each version of the software must be reviewed and approved; (b) if Cardtronics intends to install the same software

14

on more than one ATM make and model, the software need only be reviewed on the makes and models available at Cardtronics' Frisco, Texas facility; provided, however, that Cardtronics notifies the Arbiter and NFB consultant in advance that a particular make or model will not be available and identifies any material differences between that make or model and the makes and models that will be reviewed; (c) certain ATM makes and models identified in the Implementation Guidebook, which collectively make up less than one percent (1%) of the ATMs in the Existing Fleet, may be excluded at Cardtronics' discretion from the Software Review Process; and (d) certain ATM makes and models identified in the Implementation Guidebook, which are not EMV Upgradable, may be excluded from the Software Review Process at Cardtronics' discretion.

5.1.7.    The Arbiter shall document all software review and approval processes in accordance with the protocol included in the Implementation Guidebook.  For each ATM make and model reviewed, that documentation shall include: (a) the Arbiter's and the NFB consultant's observations as to the ATM's Voice Guidance functionality; (b) the Arbiter's conclusions as to whether the ATM satisfies each element of the Voice Guidance standards set forth in Section 3; (c) the Arbiter's determination as to whether the ATM will be exempt from having one or more of the Advanced Voice Guidance Features; and (d) whether the software on the ATM is approved as Basic VG Software and/or Advanced VG Software.

5.1.8.    Only software that has been approved by the Arbiter in accordance with the Software Review Process described in this Subsection 5.1 will be designated as either Basic VG Software or Advanced VG Software depending on whether it meets the requirements of Subsection 3.2 (for Basic) or Subsection 3.7 (for Advanced).

5.1.9.    Nothing in this Subsection 5.1 shall preclude Cardtronics from installing Voice Guidance software on its ATMs before such software has been approved by the Arbiter as meeting the requirements of Subsection 3.2 or 3.7.  However, no such software will be considered either Basic VG Software or Advanced VG unless and until it is approved by the Arbiter.  Accordingly, if Cardtronics installs software that is not ultimately approved by the Arbiter, it must replace it with approved software in accordance with applicable deadlines.

**5.2    Future Technology Development/Changes Affecting Voice Guidance.**

5.2.1.    If, subsequent to the Software Review Process (but still during Phase I of the Term), Cardtronics completes the development of additional software that it intends to install on Covered ATMs and that will affect the ATMs' Voice Guidance functionality, Cardtronics shall submit the software to the review and approval process described in Subsection 5.1, but shall not be required to install the software on its ATMs within any particular timeframe.

5.2.2.    If, subsequent to the Software Review Process (but still during Phase I of the Term), Cardtronics completes the development of additional software adding advanced functionality not available on Covered ATMs as of Final Approval, it shall submit the software's Voice Guidance capabilities to the review and approval process described in Subsection 5.1, but shall not be required to install the software on its ATMs until such advanced functionality features are provided at the ATM.

5.2.3.      If Cardtronics develops or installs software affecting a Covered ATM's Voice Guidance functionality during or after Phase II of the Term, it may, but is not required to, include the Arbiter and/or an NFB consultant in development and testing.

# 6.   VOICE GUIDANCE & BRAILLE INSTALLATION ON EXISTING FLEET

## 6.1   Existing Cardtronics-Owned ATMs.

6.1.1.      Cardtronics shall install Advanced VG Software on, and affix Braille decals to, all Cardtronics-Owned ATMs in its Existing Fleet no later than March 31, 2017.

6.1.2.      If any Cardtronics-Owned ATM in Cardtronics' Existing Fleet has not been upgraded with Advanced VG Software as of March 31, 2017, Cardtronics shall immediately divest itself of that ATM.

## 6.2   Existing Merchant-Owned ATMs.

6.2.1.      Cardtronics shall install Advanced VG Software on, and affix Braille decals to, all Merchant-Owned ATMs in its Existing Fleet no later than March 31, 2017.

6.2.2.      If any Merchant-Owned ATM in Cardtronics' Existing Fleet has not been upgraded with Advanced VG Software as of March 31, 2017, Cardtronics shall immediately divest itself of that ATM.

# 7.   NEWLY-ACQUIRED ATMS

## 7.1   Newly-Acquired Cardtronics-Owned ATMs.

7.1.1.      Braille.  Cardtronics will affix Braille decals to all Voice-Guided, Newly-Acquired Cardtronics-Owned ATMs within one hundred and eighty (180) days of acquisition. Thereafter, if Cardtronics or one of its vendors, an NFB tester, or a customer observes and reports that a previously affixed Braille decal is missing, Cardtronics will dispatch a technician to re-affix the decal within thirty (30) days.

7.1.2.      Voice Guidance.  Cardtronics will install new Voice Guidance software on Newly-Acquired Cardtronics-Owned ATMs as follows:

(i).  ATMs acquired in 2014 that are switched to Cardtronics' Processing Platform following acquisition shall have Advanced VG Software installed thereon no later than March 31, 2017.  If an ATM has not been upgraded with Advanced VG Software as of March 31, 2017, Cardtronics shall immediately divest itself of that ATM.

(ii).  ATMs acquired *after* 2014 that are switched or added to Cardtronics' Processing Platform within one hundred and twenty (120) days of acquisition shall have Advanced VG Software installed thereon within one year of acquisition, or by March 31, 2017, whichever is later.  If an ATM has not been upgraded with Advanced VG Software as of the applicable deadline, Cardtronics shall immediately divest itself of that ATM.

(iii).  With respect to ATMs acquired *after* 2014 that remain on a third-party Processing Platform for longer than one hundred and twenty (120) days following acquisition, Cardtronics shall confirm within that 120 day period that such ATMs have software already installed thereon that has been approved by the Arbiter as qualifying as Basic VG Software (meaning the software meets the Voice Guidance standards set forth in Subsection 3.2.1) and ensure that the ATMs retain such software until such time as they are upgraded with Advanced VG Software, which shall be the later of one year after the date the ATM is switched to Cardtronics' Processing Platform or March 31, 2017.  If an ATM is not confirmed to have software qualifying as Basic VG Software as of the 120th day following acquisition, or Advanced VG Software as of the applicable deadline, Cardtronics shall immediately divest itself of that ATM.

(iv).  Within one hundred and twenty (120) days of acquisition, Cardtronics shall divest itself of Newly-Acquired, Cardtronics-Owned ATMs that are not VG-Capable.

**7.2     Newly-Acquired Merchant-Owned ATMs.**

7.2.1.     <u>Braille</u>.  Cardtronics will affix Braille decals to all Voice-Guided, Newly-Acquired Merchant-Owned ATMs (or, in its discretion, mail the decals to the Merchants with appropriate instructions) within one hundred and eighty (180) days of acquisition.  Thereafter, if Cardtronics or one of its vendors, an NFB tester, or a customer observes and reports that a previously affixed Braille decal is missing, Cardtronics will mail a replacement decal with appropriate instructions to the Merchant within thirty (30) days.

7.2.2.     <u>Voice Guidance</u>.  Regardless of the date of acquisition or the Processing Platform, all Newly-Acquired, Merchant-Owned ATMs shall have Basic VG Software installed thereon within one year of acquisition, or by March 31, 2017, whichever is later.  Thereafter, all such ATMs shall be upgraded with Advanced VG Software within one year of being switched to Cardtronics' Processing Platform or by March 31, 2017, whichever is later.

**7.3     ATMs Removed From Cardtronics' Processing Platform.**

Once an ATM is switched or added to Cardtronics' Processing Platform, it shall not be removed to a third-party Processing Platform unless at the time of such removal it has Advanced VG Software installed thereon and it continues to operate with such Advanced VG Software following removal.

**7.4     Multiple ATMs at Single Location.**

With respect only to Newly-Acquired ATMs (*i.e.*, not Cardtronics' Existing Fleet) and limited special projects (*e.g.*, pilot programs), beginning either before or after Final Approval, nothing in this Section 7 shall preclude Cardtronics from applying the exemption covering multiple ATMs at a single location, set forth in Section 220.1 of the ADA Standards for Accessible Design, to the requirements of this Agreement.

8.    **DIVESTED ATMS**

Other than in connection with a sale by Cardtronics of all or substantially all of the ATMs in its fleet, which transaction shall be governed by Section 27 (Binding Upon Successors) of the Agreement, if Cardtronics sells any Cardtronics-Owned ATM, or its interests in any Merchant-Owned ATM, to a third-party, neither Cardtronics nor the third-party shall have any obligations under this Agreement with respect to said ATM.

9.    **MERCHANT RENEWALS & SALES**

During Phase I of this Agreement, Cardtronics shall be permitted to renew its existing contracts with Merchants so long as Cardtronics divests itself of all Merchant-Owned ATMs in the Existing Fleet that are not upgraded by March 31, 2017, irrespective of the time remaining on the applicable contracts.  As of the date of Final Approval, however, Cardtronics shall not sell or otherwise make available to Merchants or other third parties ATMs that are not Voice-Guided.

10.   **FIELD INSPECTIONS & NFB TESTING**

    10.1   **Field Inspections. During Phase I of this Agreement, as well as Phase II to the extent required by Subsection 19.2.**

        10.1.1.   <u>Cardtronics-Owned, Branded ATMs</u>.  Cardtronics shall complete Surcharge Inspections of all Cardtronics-Owned, Branded ATMs in its fleet at least once every nine (9) months.

        10.1.2.   <u>Cardtronics-Owned, Non-Branded ATMs</u>.  Cardtronics shall complete Surcharge Inspections of all Cardtronics-Owned, Non-Branded ATMs in its fleet at least once every eighteen (18) months.

        10.1.3.   <u>Merchant-Owned ATMs</u>.  Cardtronics shall complete Surcharge Inspections of at least one thousand (1,000) Merchant-Owned ATMs at least once every twelve (12) months.  The 1,000 ATMs inspected shall be those Merchant-Owned ATMs with the largest transaction volumes that Cardtronics is able to inspect.

        10.1.4.   If Cardtronics is called or otherwise required to make a repair or maintenance visit to a Cardtronics-Owned or Merchant-Owned ATM, Cardtronics shall complete a Surcharge Inspection of that ATM during the maintenance visit.  Cardtronics shall not be required to videotape such inspections.

        10.1.5.   Cardtronics shall videotape each inspection required by Subsections 10.1.1 through 10.1.3 and post the video to a secure web portal of its choosing, where it shall be made available to Plaintiffs and the Arbiter.

    10.2   **NFB Testing.**

During Phase I of the term, and using an inspection procedure and checklist agreed upon by the Parties and included in the Implementation Guidebook, the NFB will conduct up to six

hundred (600) tests of Cardtronics' ATMs in the field. Cardtronics shall compensate the testers through the NFB at the rate of $200 per inspection within thirty (30) days of submission of an invoice by the NFB to Cardtronics documenting the completion of such testing.

### 10.3   Prompt Repairs.

If a problem with an ATM's Voice Guidance functionality is found during an inspection of any kind or during an NFB field test, or is otherwise reported by a consumer, Cardtronics shall repair the problem within ten (10) calendar days, or as soon thereafter as is possible under the circumstances.

## 11.   REPORTING

### 11.1   Monthly VG/Braille Installation Reports.

Cardtronics shall provide Plaintiffs and the Arbiter with monthly reports on the status of its compliance with Section 6 (Voice Guidance & Braille Installation on Existing Fleet) and Section 7 (Newly-Acquired ATMs) until the Completion Date. The reports shall be in a form agreed upon by the Parties and included in the Implementation Guidebook and shall be due on the last day of the month following the month that is the subject of the report (*e.g.*, compliance progress during September shall be reported no later than the last day of October).

### 11.2   Quarterly Fleet Reports.

Through Phase I and Phase II of the Agreement, Cardtronics shall provide Plaintiffs and the Arbiter with quarterly reports on the composition of its fleet. The reports shall be in a form agreed upon by the Parties and included in the Implementation Guidebook and shall be due on the last day of the month following the end of each fiscal quarter (*e.g.*, the report covering the first quarter (January-March) shall be due no later than the last day of April).

## 12.   WEB LOCATOR

Through Phase I and Phase II of this Agreement, Cardtronics shall maintain on its website an ATM locator, independently usable by Blind consumers, through which consumers can determine where particular ATMs in Cardtronics' fleet are located and whether each ATM is Voice-Guided as defined in Subsection 3.1.

## 13.   CARDTRONICS ACCESSIBILITY CENTER OF EXCELLENCE.

### 13.1   Accessibility Center of Excellence.

13.1.1.   Cardtronics shall create an internal "Accessibility Center of Excellence," whose mission shall be to deliver industry-leading Voice Guidance to consumers at Cardtronics-Owned and Merchant-Owned ATMs.

13.1.2.   The Accessibility Center of Excellence shall be led by an Executive Director chosen by Cardtronics, and shall serve as a project management office for all

Cardtronics' activities and efforts related to Voice Guidance, whether in connection with this Agreement or otherwise. Cardtronics shall provide the NFB and the Arbiter with office space within the Accessibility Center of Excellence.

13.1.3. Among other efforts and activities initiated by Cardtronics in its discretion, the Accessibility Center of Excellence shall: (a) interface with industry partners (*e.g.*, manufacturers, the NFB, and others); (b) collect and maintain statistics and data regarding Cardtronics' ATM fleet composition, transaction volumes, and the usage of Voice Guidance, as available, at its ATMs; (c) maintain a library that includes, among other things, approved Voice Guidance scripts, the results of software review and approval processes, and inspection and field test reports, which shall be available for examination by Plaintiffs and the Arbiter; (d) oversee script generation, testing, and related reporting; (e) oversee Cardtronics' corporate education and training; and (f) host a Voice Guidance laboratory open to the NFB and its invitees, as well as other industry partners. Nothing herein shall require Cardtronics to disclose, release, or describe any proprietary intellectual property or knowhow, including any software, to any third parties.

13.1.4. The Accessibility Center of Excellence shall continue to operate through Phase I and Phase II of this Agreement.

**13.2   Company-Wide Policy Statement.**

Cardtronics shall adopt and make publicly available a company-wide policy statement that all domestic ATMs it owns and operates (including Cardtronics-Owned and Merchant-Owned ATMs) will comply fully with all applicable accessibility laws and regulations, including those pertaining to Voice Guidance and Braille instructions.

## 14.   CHANGES IN LAWS GOVERNING ACCESSIBILITY OF ATMS

**14.1   New Laws.**

The Parties acknowledge that after Final Approval, new statutes or regulations may establish standards for accessibility of ATM services to Blind persons that differ from Cardtronics' obligations under this Agreement. The Parties agree that if a new law or regulation directly affects one or more of Cardtronics' obligations under this Agreement, the new law or regulation shall control; provided, however, that to the extent any new law or regulation creates a safe harbor for non-Voice-Guided ATMs or establishes a schedule for implementing Voice Guidance that is longer/slower than that required by this Agreement, this Agreement shall control and, in no event, shall the degree of access to and/or independent use by Blind persons be less than that required by this Agreement.

**14.2   Notice of Modification of Agreement.**

If any Party contends that there is a change in any applicable statute or regulation that directly affects Cardtronics' obligations under this Agreement, that Party shall notify the other Parties in writing with a statement describing (a) the new statute or regulation; (b) the effect of the new statute or regulation on Cardtronics' obligations under this Agreement; and (c) the necessary modifications to this Agreement. The proposed modifications shall become effective

thirty (30) days after such notification, unless another Party objects in writing to the proposed modifications.  In the event of disagreement between the Parties over the appropriate modifications to this Agreement as contemplated by this Section 14, the Parties shall meet and confer in good faith to resolve the disagreement.  Failure to reach an agreement shall be considered a dispute to be resolved pursuant to Section 21 (Dispute Resolution) of this Agreement.

15.    **NO ADMISSION OF LIABILITY**

15.1    **Purpose of Agreement.**

This Agreement constitutes a compromise of disputed claims between Plaintiffs and Defendants, and the Parties enter this Agreement solely to terminate all controversies currently pending between them and to avoid the expense and inconvenience of further litigation, without any admission of liability by Cardtronics.

15.2    **No Admissions.**

In entering into this Agreement, Cardtronics does not admit, and specifically denies, that it has violated or failed to comply with any provisions of Title III of the ADA, Massachusetts state law, or any other applicable laws, regulations or legal requirements in regard to the accessibility of Cardtronics-Owned ATMs or Merchant-Owned ATMs.  Neither this Agreement, nor any of its terms or provisions, nor any of the negotiations connected with it, shall be construed as an admission or concession by Cardtronics of any such violations or failures to comply with any applicable law, the 2007 Class Action Settlement Agreement or the 2010 Remediation Plan.  Neither this Agreement, nor any of its terms or provisions, nor any of the negotiations connected with it, shall be construed as an admission or concession by the Commonwealth or the NFB with respect to the requirements of any applicable law, the 2007 Class Action Settlement Agreement or the 2010 Remediation Plan, or with respect to Cardtronics' compliance with such law or agreements.

15.3    **No Use of Agreement.**

The Parties agree that this Agreement shall not be used by the NFB or the Commonwealth in any legal, regulatory, equity or administrative proceeding in which Cardtronics is a party, as evidence of any stipulation or agreement by Cardtronics as to the meaning or requirements of Title III of the ADA.

15.4    **No Effect of Court Approval or Rejection.**

The Parties agree that Court approval of this Agreement shall not be deemed to constitute any finding, conclusion, or holding as to the meaning of Title III of the ADA or of Massachusetts state law.  If the Court does not grant Final Approval of this Agreement, or if any of the Parties withdraw from this Agreement at any time to the extent permitted herein, this Agreement and any negotiations or communications related thereto shall not be interpreted as any admission by any Party of any fact, legal principle, or conclusion.  If, for any reason, a Final Approval Order is not entered pursuant to this Agreement, no evidence of this Agreement or of the Preliminary

Approval Order or Final Approval Order, as proposed or as actually entered by the Court, shall be admissible in the Contempt Proceedings or in any other action in which Cardtronics is a party.

## 16.   **RELEASE**

### 16.1   Scope of Release.

16.1.1.   "Released Claims" means any and all demands, claims, actions, causes of actions, suits, debts, covenants, contracts, agreements, promises, or judgments whatsoever, whether or not known or unknown and whether or not such claims are legal, equitable, administrative or of any other nature, that the Plaintiffs and Class individually or collectively may have had, or may have, against Cardtronics concerning Cardtronics' compliance with the 2007 Class Action Settlement Agreement or 2010 Remediation Plan, its compliance with orders previously entered in the Lawsuit or Contempt Proceedings, or the accessibility of Cardtronics-Owned ATMs and Merchant-Owned ATMs to Blind patrons through the Completion Date. Released claims include, but are not limited to, claims under Title III of the ADA, the Massachusetts Public Accommodations Act, and the Massachusetts Equal Rights Act.

16.1.2.   With respect to the NFB and the Individual Plaintiffs, the Released Claims include any claims of the NFB or Individual Plaintiffs for monetary damages of any kind, including punitive or exemplary damages, and for any damages, sanctions, or penalties resulting from Cardtronics' failure to comply with orders previously entered in the Lawsuit or Contempt Proceedings.

16.1.3.   With respect to Class Members, the Released Claims do not include any claims of Class Members for monetary damages of any kind, including punitive or exemplary damages, except that the Released Claims do include any claims of Class Members for damages, sanctions or penalties resulting from Cardtronics' failure to comply with orders previously entered in the Lawsuit or Contempt Proceedings.

16.1.4.   Except as otherwise expressly provided herein, the Released Claims include any and all claims for attorneys' fees, expenses, costs or disbursements incurred by Counsel and any other counsel representing Plaintiffs or Class members, or by Plaintiffs or Class members, or any of them, in connection with or related in any manner to the Lawsuit, the Contempt Proceedings, this Agreement, or the prosecution of motions to obtain entry of Preliminary Approval and/or Final Approval incurred prior to and including the date of the Final Approval Order.

16.1.5.   Released Claims do not include an action to enforce a Decision and Order issued by the Arbiter pursuant to Section 21.3 (Dispute Resolution & Liquidated Damages), which shall be the sole relief and remedy in the event any Plaintiff or Class member claims, prior to the Completion Date, that Cardtronics-Owned ATMs or Merchant-Owned ATMs are not accessible to Blind patrons.

16.1.6.   Released Claims do not include any claims by any Plaintiff or Class member regarding the accessibility of Cardtronics-Owned ATMs or Merchant-Owned ATMs to Blind patrons accruing after the Completion Date (including during Phase II of the Term).

### 16.2    Release of Claims.

Plaintiffs and Class members hereby agree that upon entry of a Final Approval Order they shall forever release, remise, acquit, satisfy, and discharge each Defendant (and any of each Defendant's respective parents, subsidiaries, affiliates, partners and its officers, directors, attorneys, employees, agents, successors, and assigns) from any and all Released Claims.

### 16.3    No Effect On Obligations Imposed In This Agreement.

Notwithstanding anything stated to the contrary in this Agreement, all of the obligations and rights of the Parties under this Agreement shall expressly survive the release.

## 17.    THIRD-PARTY BENEFICIARIES

### 17.1    Acknowledged Beneficiaries.

This Agreement, and the settlement contemplated therein, shall inure to the benefit of the Parties as well as each Defendant's respective parents, subsidiaries, affiliates, partners and its officers, directors, attorneys, employees, agents, successors, and assigns, all of whom shall be considered third-party beneficiaries of this Agreement.  This Agreement also inures to the benefit of the Class members, each of whom shall be considered a third-party beneficiary.

### 17.2    No Other Beneficiaries.

Except as expressly identified in the foregoing subsection, this Agreement shall not be construed to create rights in, or to grant remedies to, or to delegate or create any duty, obligation or undertaking established herein to any third party as a beneficiary of this Agreement.

## 18.    PAYMENTS BY CARDTRONICS

### 18.1    Payments to the NFB and the Commonwealth.

Within thirty (30) calendar days of the Court's entry of a Final Approval Order, Cardtronics shall pay the total amount of one million, five hundred thousand dollars ($1,500,000) as follows:

18.1.1.    Cardtronics shall pay the amount of one million, two hundred fifty thousand dollars ($1,250,000) to the NFB by submitting a bank or certified check in that amount made payable to "National Federation of the Blind" to the National Federation of the Blind, 1800 Johnson Street, Baltimore, Maryland 21230, Attention: Mark Riccobono, or alternatively may pay by wire transfer pursuant to instructions to be provided by the NFB.

18.1.2.    Cardtronics shall pay the amount of two hundred fifty thousand dollars ($250,000) (hereinafter, the "Settlement Fund") to the Commonwealth by submitting a bank or certified check in that amount made payable to "Commonwealth of Massachusetts" to the Office of the Attorney General, One Ashburton Place, Boston, Massachusetts, 02108, Attention: AAG

Genevieve C. Nadeau, Civil Rights Division, or alternatively may pay by wire transfer pursuant to instructions to be provided by the Commonwealth. The Settlement Fund shall be used by the Attorney General, in her sole discretion, to promote, or to fund other programs or initiatives that promote, equal access for Blind persons or other individuals with disabilities.

### 18.2   Attorneys' Fees and Costs.

Cardtronics shall pay all reasonable attorneys' fees and costs incurred by Plaintiffs from December 19, 2013, up to and including the date of Final Approval, in connection with the Contempt Proceedings, the negotiation of this Agreement, notification to Class members, and the submission of this Agreement to the Court for Preliminary and Final Approval. The payments shall be made by wire transfer or by bank or certified check, in the same manner as the payments described in Subsection 18.1, above, within thirty (30) calendar days of Cardtronics' receipt from Plaintiffs of appropriate invoices reflecting their fees and costs.

### 18.3   Arbiter and NFB Consultant Fees.

Cardtronics will pay the Arbiter's standard hourly fee, and also pay a reasonable per diem for the NFB consultant, as well any travel expenses the Arbiter and NFB consultant incur in connection with Subsections 5.1 and 5.2.

## 19.   TERM OF AGREEMENT

### 19.1   Phase I: Certificates of Completion.

19.1.1     Except as provided in Subsection 19.2 and subject to extensions as provided in Section 23, the "Term" of this Agreement shall end, and all of Cardtronics' rights and obligations under this Agreement will terminate, upon the Arbiter's issuance of the later of two Certificates of Completion:

(i).  Cardtronics-Owned ATMs:  a Certificate of Completion will issue when all Cardtronics-Owned ATMs are in Full Compliance.

(ii). Merchant-Owned ATMs:  a Certificate of Completion will issue when all Merchant-Owned ATMs are in Full Compliance.

19.1.2.     "Full Compliance" for an ATM means that the ATM has either: (a) been divested, or (b) remains in Cardtronics' fleet and:

(i).  Cardtronics has affixed the required Braille decals (or, as applicable, mailed the decals with instructions to the Merchant) in accordance with Section 6 (Voice Guidance & Braille Installation on Existing Fleet) and Section 7 (Newly-Acquired ATMs), unless the certification date falls within one hundred and eighty (180) days of acquisition; and

(ii).  the ATM has Advanced VG Software installed thereon, unless, in accordance with Section 7 (Newly-Acquired ATMs): (a) the ATM is required only to have Basic VG Software installed thereon, in which case it must have such Basic VG Software installed

24

thereon; or (b) the ATM is not yet required to have any particular Voice Guidance software installed thereon.  Consistent with Section 7, any ATM previously on a third-party Processing Platform that was switched to Cardtronics' Processing Platform a year or more prior to the certification date must have the Advanced VG Software installed thereon in order to qualify as being in Full Compliance.

19.1.3.     The Arbiter will issue each Certificate of Completion only when one hundred percent (100%) of the respective ATMs are in Full Compliance; provided, however, that the Arbiter may issue either Certificate of Completion if no more than 250 ATMs in each of the Cardtronics-Owned and Merchant-Owned fleets still remain to be upgraded or divested.

19.1.4.     "Completion Date" is the date on which the Arbiter issues the later of both Certificates of Completion and marks the end of Phase I of the Term.

19.1.5.     Nothing in this Section, including the issuance of one or both Certificates of Completion, shall be interpreted to relieve Cardtronics of its obligation to pay liquidated damages, in accordance with Subsection 21.4, for any ATM (Cardtronics-Owned or Merchant-Owned) that does not have the required Braille decals affixed thereto (or, as applicable, mailed to the Merchant) or that is/was not upgraded or divested as required, within the applicable deadlines set forth herein.

**19.2    Phase II:  Remaining Obligations**

Phase II of the term shall continue for seven (7) fiscal quarters following the Completion Date.  During Phase II, Cardtronics' obligations in Subsection 11.2 (Quarterly Fleet Reports) shall remain in effect.  In addition, following the Completion Date and before the end of Phase II, Cardtronics shall be required to complete one full inspection cycle of its entire fleet of Cardtronics-Owned and Merchant-Owned ATMs in accordance with the specific requirements of Subsection 10.1 (Field Inspections) and Subsection 10.3 (Prompt Repairs).

**20.    FURTHER ACTS**

Each of the Parties, upon the request of any of the other Parties hereto, agrees to perform such further acts and to execute and deliver such other documents as are reasonably necessary to carry out the provisions of this Agreement.  In addition, upon reasonable request of Counsel, Cardtronics shall provide basic information to assist Plaintiffs in making a general or preliminary determination of whether Cardtronics has complied with the terms of this Agreement.

**21.    DISPUTE RESOLUTION & LIQUIDATED DAMAGES**

**21.1    Notification of Non-Compliance and Opportunity to Cure.**

If at any time a Party believes that another Party has not complied with any provision of this Agreement, the complaining Party shall deliver prompt written notice to the other Party ("Notice of Noncompliance"), including: (a) a reference to the specific provisions of the Agreement that are the subject of the notice; (b) a statement of the issues; (c) a statement of the remedial action sought by the complaining Party; and (d) a brief statement of the specific facts,

circumstances and any other arguments supporting the position of the complaining Party. The Party receiving the Notice of Noncompliance shall respond in writing to the notice within twenty (20) business days of its receipt. The response shall describe the steps that the receiving Party will take, if any, to cure the noncompliance.

### 21.2    Meet and Confer.

Within twenty (20) business days after receipt of a response to a Notice of Noncompliance, or as soon as practicable, the Parties shall meet and confer to attempt to reach an agreement regarding the matters identified therein. If the Parties are able to agree upon a resolution, they shall work together in good faith to effectuate that resolution, including, as appropriate, modification of the Agreement. Any Party may agree to extend any of the deadlines for an opposing Party set forth in Subsections 21.1 and 21.2 without the necessity of modifying this Agreement.

### 21.3    Submission to Arbiter.

If the Parties are not able to reach an agreement regarding the Notice of Noncompliance, the complaining Party shall submit the original Notice of Noncompliance, along with the other Party's response and any other substantive correspondence, to the Arbiter. The Arbiter will make a final, binding decision as to the issues raised in the Notice of Noncompliance after considering the relevant evidence and arguments presented by the Parties as follows:

21.3.1.    Within fourteen (14) days of receipt of the Notice of Noncompliance and other responsive documents, the Arbiter shall set a fact-finding and/or briefing schedule which shall be concluded no more than one hundred and twenty (120) days thereafter, unless the Arbiter determines in his discretion that extraordinary circumstances justify a longer or more expanded schedule. As reasonably necessary in light of the nature of the Parties' dispute(s), the fact-finding and/or briefing schedule may include, but is not necessarily limited to, the following, and must be thoroughly documented and explained by the Arbiter.

(i).    An initial administrative conference by telephone with the Parties and their Counsel to discuss the dispute(s) between them and proposed fact-finding and/or briefing schedules;

(ii).    An early dispositive motion at the request of one or more Parties, if such motion can be resolved on the basis of material facts that are not in genuine dispute and if such motion will resolve all or a significant portion of the disputed issues;

(iii).    Witness and/or Party interviews, including recorded interviews (all of which Counsel shall have a right to attend), to be conducted at or near the place of employment of the witness or Party unless otherwise agreed to by the witness or Party;

(iv).    Exchange of reasonable and limited request for documents and information, and responses thereto (as well as a requirement that the Parties may not submit to the Arbiter any documents or exhibits which have not been provided to the other Party within the

timeline for doing so, unless such documents or exhibits are publically available, nor may the Arbiter rely on any documents or information not shared with the Parties);

(v).  One or more written briefs by the Parties, as well as briefs in opposition (only if the Arbiter determines that extraordinary circumstances justify reply briefs will such briefs be permitted);

(vi).  An in-person hearing which, if the Parties agree, will be recorded by stenographic means; and

(vii).  Ex parte communications with the Parties and their Counsel only as consented to by the Parties.

21.3.2.    No later than thirty (30) days after the conclusion of the fact-finding and/or briefing schedule, the Arbiter shall issue a written Decision and Order setting forth in detail his decision on the merits of the dispute(s) at issue and his reasoning therefore.

21.3.3.    If the Arbiter determines that Cardtronics has failed to comply with any of its obligations under this Agreement, his Decision and Order shall award liquidated damages in accordance with Subsection 21.4, below, as well as appropriate injunctive relief.

21.3.4.    Either as part of the Decision and Order, or upon a separate application by a Party, the Arbiter shall award reasonable attorneys' fees and costs to the prevailing complaining Party in accordance with ADA case law and *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978).

21.3.5.    The Parties shall have the right, and the Court shall have jurisdiction, to enforce any Decision and Order issued by the Arbiter pursuant to this Section 21.3, including but not limited to orders to Cardtronics to pay liquidated damages and/or to divest itself of noncompliant ATMs.  The Court shall review a motion to confirm or vacate any Decision and Order of the Arbiter in accordance with the Federal Arbitration Act, 9 U.S.C. §§ 9, 10 and 11, and applicable case law.

21.3.6.    In any proceeding to confirm or vacate any Decision and Order of the Arbiter, including in the District Court and the Court of Appeals, the prevailing complaining Party shall be entitled to an award of reasonable attorneys' fees and costs in accordance with ADA case law and *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978).

**21.4    Liquidated Damages.**

21.4.1.    The parties acknowledge and agree that, at the time they drafted this Agreement, the damages that would be incurred by Plaintiffs and the Class in the event Cardtronics breaches the Agreement were difficult to ascertain, but that the sums set forth below nevertheless represent a reasonable forecast of those damages.  Cardtronics agrees not to challenge either the characterization of the below sums as liquidated damages or the enforceability of this Subsection 21.4 in any administrative or court proceeding (including any proceedings governed by this Agreement).

21.4.2.    In the event that the Arbiter finds that Cardtronics has breached any of its obligations under this Agreement, Cardtronics shall be required to pay liquidated damages as follows:

(i). If Cardtronics fails to meet any of the deadlines set forth in Section 6 (Voice Guidance & Braille Installation Existing Fleet) or Section 7 (Newly-Acquired ATMs) applicable to <u>Cardtronics-Owned ATMs</u> (or to divest itself of those ATMs), it shall pay liquidated damages of five thousand dollars ($5,000) per month for each ATM above two hundred and fifty (250) ATMs out of compliance, up to a monthly maximum of two hundred thousand dollars ($200,000).

(ii). If Cardtronics fails to meet any of the deadlines set forth in Section 6 (Voice Guidance & Braille Installation Existing Fleet) or Section 7 (Newly-Acquired ATMs) applicable to <u>Merchant-Owned ATMs</u> (or to divest itself of those ATMs), it shall pay liquidated damages of two thousand and five hundred ($2,500) per month for each ATM above one percent (1%) of the ATMs in its Merchant-Owned fleet out of compliance, up to a monthly maximum of fifty thousand dollars ($50,000).

(iii). If Cardtronics submits any report required by Section 11 (Reporting) more than thirty (30) days after the deadline, it shall pay liquidated damages of fifteen thousand dollars ($15,000) for each such report.

21.4.3.    Liquidated damages paid pursuant to this Section shall be divided as follows: seventy percent (70%) to the NFB and thirty percent (30%) to the Commonwealth.  The payments shall be made by bank or certified check, in the same manner as the payments described in Subsections 18.1.1 and 18.1.2, within thirty (30) calendar days of the Arbiter's issuance of the Decision and Order, unless a motion to vacate the Decision and Order is filed with the Court.

21.4.4.    With the exception of injunctive relief, which the Arbiter may order to ensure Cardtronics' compliance with this Agreement, the liquidated damages and attorneys' fees/costs described in this Section 21.4 shall be Plaintiffs' sole remedy for Cardtronics' failure to meet its obligations under this Agreement.

21.4.5.    The Court's review of the Decision and Order shall be limited to determining if the applicable Party has complied in full with the Decision and Order and, if not, issuing appropriate orders to compel compliance.

## 22.    <u>GOVERNING LAW</u>

The terms and conditions of this Agreement shall be governed, interpreted and construed, and all disputes arising hereunder determined, in accordance with the laws of the Commonwealth of Massachusetts, without regard to its choice of law rules.

23.    **FORCE MAJEURE**

### 23.1    Performance Made Impossible by Third Parties.

With respect to both Cardtronics-Owned and Merchant-Owned ATMs, the deadlines set forth in this Agreement may be extended to the extent that Cardtronics can demonstrate that timely performance was or will be made impossible by third-party actions, including hardware shortages or unanticipated technician unavailability.  The length of the extension shall be the shortest time necessary for the condition causing the impossibility to be resolved, and the extension will apply to all deadlines in this Agreement (*e.g.*, the extension will also extend Phases I and II of the Term).  Cardtronics shall notify Plaintiffs and the Arbiter in writing within thirty (30) days of determining that timely performance is made impossible by third-party actions.  Said notice shall include the length of the delay Cardtronics expects as a result of third-party actions, and shall include specific facts describing both the third-party actions, and the reason(s) why those actions render timely compliance impossible.

### 23.2    Extension of EMV Liability Shift Date.

With respect only to Merchant-Owned ATMs, and subject to the notice requirements of Subsection 23.1, above, any extension in the earliest applicable EMV Liability Shift Date will permit extension of all deadlines in this Agreement (and a corresponding extension of Phases I and II of the Term) by an amount of time equal to such extension, up to a maximum of eighteen (18) months.

### 23.3    Disputes as to Extensions.

The Arbiter shall have the authority to resolve disputes between the Parties as to any extension sought pursuant to this Section 23.3.

24.    **NOTICE TO PARTIES**

Any notice or communication required or permitted to be given to any one of the Parties shall be provided by electronic mail, by facsimile transmission, or by certified U.S. mail, addressed as follows:

*To the Commonwealth:*

Office of the Massachusetts Attorney General
Attn:  Genevieve C. Nadeau
Assistant Attorney General
One Ashburton Place, 18th floor
Boston, MA  02108
Fax No.:  (617) 727-5762
Email: genevieve.nadeau@state.ma.us

*To the NFB:*

Brown, Goldstein & Levy LLP
Attn:  Sharon Krevor-Weisbaum, Esq.
120 E. Baltimore Street, Ste. 1700
Baltimore, MD  21202
Fax No.:  (410) 385-0869
Email:  skw@browngold.com

*To Cardtronics:*

Cardtronics, Inc.
Cardtronics USA, Inc.
Attn: Michael E. Keller
General Counsel
3250 Briarpark Drive, Suite 400
Houston, Texas 77042 USA
Fax No.:  (832) 308-4761
Email:  mkeller@cardtronics.com

Cooley LLP
Attn:  Douglas P. Lobel
One Freedom Square | Reston Town Center
11951 Freedom Drive
Reston, VA 20190
Fax No.:  (703) 456-8100
Email:  dlobel@cooley.com

A Party may amend the person to whom notices are to be made pursuant to this Section 24 by written notice to all other Parties.

## 25.     SEVERABILITY

After Final Approval, if one or more provisions of this Agreement are at any time found to be invalid by a court, tribunal or other forum of competent jurisdiction, or otherwise rendered unenforceable, such provision or provisions shall be severable from this Agreement so that the validity or enforceability of the remaining provisions of this Agreement, shall not be affected thereby, unless the provision or provisions are essential and material covenants of this Agreement.

## 26.     DUTIES OF SIGNATORIES

By signing this Agreement, each signatory, on behalf of himself/herself or on behalf of the Party whom he or she represents, confirms and states that he or she has carefully read the Agreement and that he or she has obtained the advice of legal counsel in connection with the negotiation of this Agreement, and that he or she knows the contents of the Agreement.  Each

signatory further represents that he or she has been duly authorized on behalf of the Party that he or she represents to execute this Agreement on behalf of such Party and intends to commit, and hereby commits, the Party to be fully bound to this Agreement.

## 27.   BINDING UPON SUCCESSORS

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective parents, subsidiaries, heirs, executors, personal representatives, affiliates, agents and general and limited partners, and their respective successors and assigns; provided, however, that if Cardtronics is acquired by a third party, the new owner will assume the obligations of this Agreement only as to Cardtronics' then-existing fleet of ATMs (both Cardtronics-Owned ATMs and Merchant-Owned ATMs) as of the date of the closing of such transaction, and not as to the new owner's existing fleet.  Counsel for the Parties shall be notified in writing within thirty (30) days of the existence, name, address and telephone number of any successors and assigns.

## 28.   DELEGATION

Cardtronics, at its sole and unilateral discretion, may perform or have performed any performance obligations it has under this Agreement by, with or through third parties, such as (by way of example only and not by way of limitation) subcontractors, vendors, and outsourced resources.  Cardtronics may not, however, assign its obligations under this Agreement except as set forth in Section 27 (Binding Upon Successors).

## 29.   AUTHORITY TO ENTER AGREEMENT

Each Party represents and warrants to the other Parties that it has the full power and authority to enter into this Agreement and any of the documents to be executed by it pursuant to this Agreement, that it has agreed to the terms of this Agreement and such other documents to be executed by it pursuant to this Agreement, and that this Agreement and such other documents have been duly authorized, executed and delivered by the representatives whose signatures are set forth below.

## 30.   DRAFTING OF AGREEMENT

The Parties and their respective Counsel have reviewed and revised this Agreement and the normal rule of construction, providing that any ambiguities are to be resolved against the drafting Party, shall not be employed in the interpretation of this Agreement.

## 31.   NON-WAIVER OF BREACH

No breach of any provision of this Agreement can be waived unless done so expressly and in writing.  Express written waiver of any one breach of this Agreement shall not be deemed a waiver of any other breach of the same or other provision of this Agreement.

## 32.   INTEGRATION CLAUSE

All agreements, covenants, representations and warranties, express and implied, oral and written, of the Parties concerning the subject matter of this Agreement are contained or referred to in this Agreement. No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any Party to the other Parties concerning the subject matter of this Agreement. All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter of this Agreement, other than those referred to herein, are merged into this Agreement. By way of example and not by way of limitation, the following are superceded and rendered null and void:  the 2007 Settlement Agreement and the 2010 Remediation Plan.

## 33.   AMENDMENTS OR MODIFICATIONS

This Agreement shall not be modified, amended, changed or dissolved except in writing and signed by each of the Parties.

## 34.   HEADERS IN THIS AGREEMENT

This Agreement contains headings. The headings are for the convenience of reference only and are not intended to define, limit or describe the scope or intent of any provision of this Agreement.

## 35.   SIGNATURE IN COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed an original and shall be deemed duly executed and effective upon the signing of the last counterpart by the Parties.

## 36.   TRANSMITTED COPIES

For purposes of enforcing this Agreement, the Parties may enforce this Agreement by using a signature transmitted by facsimile or by electronic copy (*e.g.*, PDF file).

**ON BEHALF OF THE COMMONWEALTH OF MASSACHUSETTS:**

By:  _____

Genevieve C. Nadeau
Assistant Attorney General

Dated:  _____November 21_____, 2014

32

**ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:**

By: _____

Mark Riccobono
President

Dated: _____November 10_____, 2014

**ON BEHALF OF THEMSELVES:**

Jennifer Bose: _____  Dated: _____, 2014

Bryan Bashin: _____  Dated: _____, 2014

Robert Crowley: _____  Dated: _____, 2014

Dwight Sayer: _____  Dated: _____, 2014

Raymond Wayne: _____  Dated: _____, 2014

Terri Uttermohlen: _____  Dated: _____, 2014

Norma Crosby: _____  Dated: _____, 2014

**ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:**

By: _____

Steven Rathgaber
Chief Executive Officer

Dated: _____, 2014

**ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:**

By: _____

Mark Riccobono
President

Dated: _____, 2014

**ON BEHALF OF THEMSELVES:**

Jennifer Bose: _____ Dated: _____November 18_____, 2014

Bryan Bashin: _____ Dated: _____, 2014

Robert Crowley: _____ Dated: _____, 2014

Dwight Sayer: _____ Dated: _____, 2014

Raymond Wayne: _____ Dated: _____, 2014

Terri Uttermohlen: _____ Dated: _____, 2014

Norma Crosby: _____ Dated: _____, 2014

**ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:**

By: _____

Steven Rathgaber
Chief Executive Officer

Dated: _____, 2014

**ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:**

By: _____

Mark Riccobono
President

Dated: _____, 2014

**ON BEHALF OF THEMSELVES:**

Jennifer Bose: _____ Dated: _____, 2014

Bryan Bashin: *Bryan Bashin* Dated: November 11, 2014

Robert Crowley: _____ Dated: _____, 2014

Dwight Sayer: _____ Dated: _____, 2014

Raymond Wayne: _____ Dated: _____, 2014

Terri Uttermohlen: _____ Dated: _____, 2014

Norma Crosby: _____ Dated: _____, 2014

**ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:**

By: _____

Steven Rathgaber
Chief Executive Officer

Dated: _____, 2014

33

**ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:**

By: _____

Mark Riccobono
President

Dated: _____, 2014

**ON BEHALF OF THEMSELVES:**

Jennifer Bose: _____   Dated: _____, 2014

Bryan Bashin: _____   Dated: _____, 2014

Robert Crowley: _____*robert Crowly*_____   Dated: ___November 18___, 2014

Dwight Sayer: _____   Dated: _____, 2014

Raymond Wayne: _____   Dated: _____, 2014

Terri Uttermohlen: _____   Dated: _____, 2014

Norma Crosby: _____   Dated: _____, 2014

**ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:**

By: _____

Steven Rathgaber
Chief Executive Officer

Dated: _____, 2014

33

ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:

By: _____

Mark Riccobono
President

Dated: _____, 2014

ON BEHALF OF THEMSELVES:

Jennifer Bose: _____   Dated: _____, 2014

Bryan Bashin: _____   Dated: _____, 2014

Robert Crowley: _____   Dated: _____, 2014

Dwight Sayer: _____   Dated: 11/11/14 , 2014

Raymond Wayne: _____   Dated: _____, 2014

Terri Uttermohlen: _____   Dated: _____, 2014

Norma Crosby: _____   Dated: _____, 2014

ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:

By: _____

Steven Rathgaber
Chief Executive Officer

Dated: _____, 2014

33

**ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:**

By:  _____

Mark Riccobono
President

Dated: _____, 2014

**ON BEHALF OF THEMSELVES:**

Jennifer Bose: _____  Dated: _____, 2014

Bryan Bashin: _____  Dated: _____, 2014

Robert Crowley: _____  Dated: _____, 2014

Dwight Sayer: _____  Dated: _____, 2014

Raymond Wayne: _____~signature~_____  Dated: __November 20__, 2014

Terri Uttermohlen: _____  Dated: _____, 2014

Norma Crosby: _____  Dated: _____, 2014

**ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:**

By:  _____

Steven Rathgaber
Chief Executive Officer

Dated: _____, 2014

**ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:**

By: _____

Mark Riccobono
President

Dated: _____, 2014

**ON BEHALF OF THEMSELVES:**

Jennifer Bose:     _____     Dated: _____, 2014

Bryan Bashin:     _____     Dated: _____, 2014

Robert Crowley:     _____     Dated: _____, 2014

Dwight Sayer:     _____     Dated: _____, 2014

Raymond Wayne:     _____     Dated: _____, 2014

Terri Uttermohlen:     _____     Dated: *Nov. 15* , 2014

Norma Crosby:     _____     Dated: _____, 2014

**ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:**

By: _____

Steven Rathgaber
Chief Executive Officer

Dated: _____, 2014

**ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:**

By: _____

Mark Riccobono
President

Dated: _____, 2014

**ON BEHALF OF THEMSELVES:**

Jennifer Bose: _____ Dated: _____, 2014

Bryan Bashin: _____ Dated: _____, 2014

Robert Crowley: _____ Dated: _____, 2014

Dwight Sayer: _____ Dated: _____, 2014

Raymond Wayne: _____ Dated: _____, 2014

Terri Uttermohlen: _____ Dated: _____, 2014

Norma Crosby: _____ Dated: **11-18**_____, 2014

**ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:**

By: _____

Steven Rathgaber
Chief Executive Officer

Dated: _____, 2014

**ON BEHALF OF THE NATIONAL FEDERATION OF THE BLIND:**

By: _____

Mark Riccobono
President

Dated: _____, 2014

**ON BEHALF OF THEMSELVES:**

Jennifer Bose: _____   Dated: _____, 2014

Bryan Bashin: _____   Dated: _____, 2014

Robert Crowley: _____   Dated: _____, 2014

Dwight Sayer: _____   Dated: _____, 2014

Raymond Wayne: _____   Dated: _____, 2014

Terri Uttermohlen: _____   Dated: _____, 2014

Norma Crosby: _____   Dated: _____, 2014

**ON BEHALF OF CARDTRONICS, INC. AND CARDTRONICS USA, INC.:**

By: _Steven Rathgaber (signature)_

Steven Rathgaber
Chief Executive Officer

Dated: _November 12_, 2014

Approved
By
Cardtronics Legal Dept.
_MR 11-12-14_

33

# APPENDICES

Appendix A:  List of Organizations to Receive a Copy of the Settlement Notice

Appendix B:  Contents of Implementation Guidebook

**APPENDIX A:**

**ORGANIZATIONS TO RECEIVE A COPY OF THE SETTLEMENT NOTICE
(SUBSECTION 2.3)**

1.  National Council on Independent Living (for e-mailing to its affiliates)

2.  National Disability Rights Network (for e-mailing to its affiliates)

**APPENDIX B:**

**CONTENTS OF IMPLEMENTATION GUIDEBOOK**

1.   Braille Instructions (Section 4)

2.   Software Review Protocol (Section 5)

3.   ATM Makes/Models Excluded from Software Review Process (Subsection 5.1.6)

4.   Cardtronics Surcharge Inspection Protocol (Subsection 10.1)

5.   NFB Inspection Procedure and Questionnaire (Subsection 10.2)

6.   Monthly VG/Braille Installation Report format (Subsection 11.1)

7.   Quarterly Fleet Report format (Subsection 11.2)